LEWIS H. SPENCE, receiver,[1] vs. ELLEN O'BRIEN.

Suffolk. October 14, 1982. — March 21, 1983.

Present: HALE, C.J., CUTTER, & PERRETTA, JJ.

*Boston Housing Authority. Housing. Landlord and Tenant,* Eviction.

In a summary process action to evict a tenant from a public housing project there was sufficient evidence to warrant the judge's findings that the tenant had permitted illegal drugs to be kept and sold in her apartment in violation of certain clauses of her lease and that the Boston Housing Authority had good cause to evict her under G. L. c. 121B, § 32. [493-495]

In a summary process action to evict a tenant from a public housing project, the judge correctly concluded that, in the circumstances, even though her lease described the tenancy as "from month to month," the tenant was not a tenant at will and the Boston Housing Authority was not required to terminate her tenancy on a rent day in accordance with G. L. c. 186, § 12, and that the housing authority's notice to quit, providing that she vacate the premises within thirty days of receipt of the notice, was proper. [495-498]

In the circumstances, a tenant in a public housing project was adequately apprised by the Boston Housing Authority of what conduct it intended to review to determine whether it should commence eviction proceedings against her, even assuming that notices sent to her by the Authority pursuant to Federal regulations were facially deficient in some respect. [498]

A defendant's failure to raise at trial a claim involving a factual determination which could have been resolved at trial by the use of a tape recording of a prior hearing precluded review of the claim on appeal. [498-499]

In a summary process action to evict a tenant from a public housing project, the judge did not err in refusing to allow the tenant to raise the defense of uninhabitable conditions under G. L. c. 239, § 8A, on the basis of her contention that her eviction was based upon cause and not fault, where she was not without fault in knowing and tolerating the misconduct of another person who had kept and sold illegal drugs in her apartment. [499]

[1] In his capacity as receiver of the Boston Housing Authority.

CIVIL ACTION commenced in the Boston Division of the Housing Court Department on April 27, 1981.

The case was heard by *King, J.*

*Jeanne Charn (Gary Bellow* with her) for the defendant.

*Richard Friedman (Richard M. Bluestein* with him) for the plaintiff.

PERRETTA, J.  The Boston Housing Authority (BHA) brought a summary process action against Ellen O'Brien (tenant), claiming that she had allowed illegal drug transactions to occur on its premises at the Washington Beech Development (Development) in Roslindale.  A judge of the Boston Housing Court found that the tenant had permitted her apartment to be used for the possession and the sale of illegal drugs in violation of certain clauses of her lease and that the BHA had "good cause" to evict her under G. L. c. 121B, § 32, as amended through St. 1979, c. 669, § 1.[2] The judge also concluded that even though the lease described the tenancy as "from month to month," O'Brien was not a tenant at will and the BHA was not required to terminate her tenancy on a rent day.  See G. L. c. 186, § 12.[3] The tenant appeals, and we affirm the judgment.

1. *The Facts.*

The BHA owns and manages the federally-aided "low income housing project," see 42 U.S.C. § 1437(a)(b)(1), as amended by Act of August 13, 1981, Pub. L. No. 97-35, Title III, § 322(a), in which the tenant and her three children reside, specifically, apartment 52 at 15 Beechland Street. The tenancy is subject to the provisions of 24 C.F.R § 866.1

---

[2] That statute provides in pertinent part: "The tenancy of a tenant of a housing authority shall not be terminated without cause and without reasons therefor given to said tenant in writing . . . . The housing authority's determination of cause shall be reviewable in the district court whenever an action for summary process is brought for possession of the premises."

[3] General Laws c. 186, § 12, has been construed to require, for a tenancy at will, notice to vacate which specifies termination on a rent day. *See Connors v. Wick,* 317 Mass. 628, 630-631 (1945); *U-Dryvit Auto Rental Co. v. Shaw,* 319 Mass. 684, 685 (1946).

et seq., and § 866.5 et seq. (1982). Both 24 C.F.R. § 866.4(*l*)(1) (1982), [4] and G. L. c. 121B, § 32, require cause for termination of the tenancy by the BHA.

O'Brien began her tenancy with the BHA at the development by a written lease dated September 1, 1976. In September of 1980, one James Harris moved into the tenant's apartment, bringing his clothing, stereo, and a three-beam metric scale. O'Brien knew that Harris brought the scale and that he stored it on the top shelf of her bedroom closet. Harris had his own key to O'Brien's car and apartment.

Harris lived with the tenant from September through November, and intermittently in December, 1980. On November 21, 1980, the Boston police entered and searched O'Brien's apartment under a search warrant issued by the Roxbury District Court.[5] In the apartment the police found and seized 9 small bags, each containing one-half ounce of marijuana, 1 box of plastic bags, 1 roll of Scotch tape, 50 manila envelopes, a three-beam scale, and, on the grounds outside the premises, they recovered a bag containing about 128 grams of marijuana. The police arrested Harris, who was in the apartment at the time of the search; O'Brien was not home.

On December 26, 1980, the BHA gave written notice to O'Brien of a private conference with the manager of the development and the attorney for the BHA, on January 7, 1981, to discuss her possible lease violations, in particular: "[r]ent owed" and "[s]earch of your apartment

---

[4]Section 866.4(*l*)(1) (1982) provides in pertinent part that the public housing authority "shall not terminate . . . the lease other than for serious or repeated violation of material terms of the lease . . . or for other good cause."

[5]The warrant authorized a search for "[h]eroin, a class A controlled substance and all paraphernalia used in the weighing, bagging, cutting, or distribution of controlled substance[s]. All books, papers, and currency to show dealings in controlled substance and personal papers or keys to show occupancy of Apt. #52 at 15 Beechland Street, Roslindale, Massachusetts."

by Boston Police Department on 11/21/80 and seizure of controlled substances and paraphernalia." The notice further informed O'Brien that after the conference, the manager would decide whether to proceed with an eviction and that she could request a hearing concerning that decision "under the grievance procedure" which was also explained in the notice.

O'Brien attended the January 7 conference, and she thereafter received an undated notice advising her that the BHA "has decided to terminate your lease . . . for the reasons set forth in the private conference notice" of December 26, 1980. The grievance procedure was again described and O'Brien requested a hearing. By notice dated February 10, 1981, O'Brien was advised that the grievance hearing panel would hear her appeal on March 4, 1981, and determine if she had violated clauses 10(2), (5), (9), and (10) of her lease on the basis of the following facts: "Possession, sale, or possession with intent to sell illegal drugs."[6] The hearing was held as scheduled, and the grievance hearing panel voted that same day, as appears from its decision dated March 4, 1981, to proceed with an eviction for the reason that the "[t]enant admitted to drugs being sold out of her apartment." This decision was attached to a notice to quit, dated March 9, 1981, advising O'Brien "to quit and deliver up thirty (30) days from receipt of this notice the premises."[7]

At the trial in the Boston Housing Court on the BHA's summary process complaint, Boston police Detective Joseph Driscoll related that the tenant's apartment had been under

---

[6]The lease provides for termination by the BHA under clause 10 for the following, among other, reasons: "(2) Reasonable likelihood of serious repeated interference with the rights of other tenants . . . (5) Creation or maintenance of a serious threat to the health or safety of other tenants . . . (9) In the event the tenant uses the premises for immoral or illegal purposes . . . (10) In the event of a violation by the Tenant of any of the terms, conditions or covenants of this lease."

[7]Neither the decision of the grievance hearing panel nor the notice to quit contained any reference to the provisions of the lease, although the decision appended to the notice did recite the factual basis for the determination to evict.

police surveillance for a one-week period in November, 1980, and that during that period he had observed people come to the premises and leave, smoking what appeared to him as marijuana cigarettes. He also testified to the search of the tenant's apartment, the seizure of the previously described items, and the arrest of Harris.[8]

O'Brien testified that she found Harris' marijuana in her apartment in August, before he had moved in with her, that although she never saw him sell marijuana from the apartment, she knew that he was deriving his livelihood from sales of marijuana, and that she told Harris that he had to get the marijuana out of the apartment or leave. O'Brien stated that Harris had promised to do so within a week but the police arrived before he had the opportunity to do so.

2. *Cause to Evict.*

The tenant claims that her eviction cannot be upheld because the BHA failed to show: (1) that her actions had any particular adverse impact on other tenants; (2) that Harris was a member of her household; (3) that she had participated in or knew of drug sales in the apartment; and (4) that the BHA had a legitimate interest to further by her eviction, since her relationship with Harris ended in December, 1980.

Even assuming that the tenant is correct in her assertion that a violation of a criminal statute is not per se cause to evict, we think it obvious that use of the premises for illegal drug sales constitutes a breach of those terms of the lease cited by the BHA.[9] See note 6, *supra.* Whether there was

---

[8] O'Brien stipulated at trial that Detective Driscoll related to the grievance hearing panel "his observations and actions before, during, and after the search."

[9] General Laws c. 121B, § 32, was amended by St. 1981, c. 510, effective November 5, 1981, to provide that a hearing before the housing authority may be waived where "there is reasonable cause to believe that the tenant or a member of the tenant's household has . . . (5) on or near housing authority property, unlawfully possessed, sold, or possessed with intent to distribute a controlled substance as defined in classes A, B or C of section thirty-one of chapter ninety-four C." Marijuana is a class D controlled substance.

cause to evict, however, depends upon Harris' status within the apartment and upon O'Brien's "awareness of and ability to prevent" his activities.[10]  *Spence* v. *Gormley,* 387 Mass. 258, 265 (1982).  See also *Spence* v. *Reeder,* 382 Mass. 398, 421 (1981).

O'Brien characterizes Harris as a "short-term co-occupant" whereas the BHA describes him as a member of her household.  The evidence of the circumstances and the duration of Harris' stay at O'Brien's apartment was sufficient to impose upon her liability for his activities while there, if she had knowledge of and the ability to prevent them.  See *Spence* v. *Gormley,* 387 Mass. at 266-273.

O'Brien's testimony that she knew there were drugs and drug paraphernalia in her apartment, that she knew Harris earned his money from drug sales, and that she was at home "most of the time," taken with Detective Driscoll's testimony concerning his observations during the surveillance period, could reasonably lead one to conclude that shortly after Harris moved in she knew her apartment was being used for the possession and sales of drugs by him.

We do not regard O'Brien's requests and demands, no matter how frequent, that Harris remove the drugs from her apartment nor her acceptance of his word that he would do so as sufficient attempts to prevent that activity which led to her eviction.  Cf. *Spence* v. *Gormley,* 387 Mass. at 266 ("A tenant's ability to avert violent conduct by a household member on housing authority premises, however, extends beyond the power actually to control his conduct by force or persuasion").  While a tenant may be reluctant to take effective preventive action against a friend or relative, a failure to do so cannot be ignored at the expense of other tenants' rights.  We see no error in the trial judge's finding that the tenant "permitted her apartment to be used for the possession and sale of illegal drugs in violation . . . of her lease."

---

[10] While the BHA argues in the alternative that at trial it proved that O'Brien was "an active participant in the misconduct," we do not consider that contention.  The record indicates that the notices to and the proceedings against O'Brien arose out of her sufferance of Harris' activities.

O'Brien argues that where, as here, the proscribed activity was committed by a person who no longer resides with the tenant, the public landlord has no interest to further by an eviction of the tenant, and good cause cannot be found to exist. See *Spence* v. *Gormley,* 387 Mass. at 272 ("If the wrongdoer were dead, or confined for an extended period of time, eviction would serve no purpose. If the unwanted visitor were not a household member, the likelihood that the tenant's presence would attract him to the project might be too slight to sustain the eviction. Cf. *Tyson* v. *New York City Hous. Auth.,* 369 F. Supp. 513, 518-519 [S.D.N.Y. 1974]"). It must be remembered, however, that O'Brien is in breach of the terms and conditions of her lease by reason of her knowledge and tolerance of Harris' conduct over a prolonged period of time. "The element of personal responsibility encompassed by § 32 also adds to the connection between eviction and legitimate government purposes. As construed, § 32 serves to encourage tenants to attempt to guide the conduct of household members, and to seek help when they are unable to." *Spence* v. *Gormley,* 387 Mass. at 273.[11]

O'Brien's eviction is founded upon "good cause reasonably related to the protection of some legitimate interest of the public landlord." *Spence* v. *Reeder,* 382 Mass. at 420.

3. *Notice to Quit.*

Because the term of the lease was "from month to month," O'Brien contends that she was a tenant at will entitled to notice to quit in accordance with G. L. c. 186, § 12, which, as earlier noted, has been construed to require that termination of a tenancy at will coincide with a rent day. See note 3, *supra.* O'Brien's rent day is the first day of each month, she received a notice to quit on March 12, 1981, and the

---

[11] The element of personal responsibility also disposes of O'Brien's contention that the constitutional claims resolved in *Spence* v. *Gormley* would have to be reconsidered where the cause for eviction was based upon illegal but nonviolent acts of a third person "temporarily present . . . but now permanently gone."

notice provided that she was "to quit and deliver up" the premises within thirty days of the receipt of the notice, i.e., by April 12, 1981.

Notwithstanding the "from month to month" language in the lease, that instrument cannot be construed as creating a tenancy at will, the distinguishing characteristic of which is that it is terminable by either the tenant *or* the landlord. See Stanisky, Landlord and Tenant § 93 (1977); Schoskinski, American Law of Landlord and Tenant § 2:16 (1980). Under the terms of the BHA lease here in dispute, the tenant may terminate the tenancy "at any time by giving (15) days written notice," whereas the BHA may terminate only for cause. G. L. c. 121B, § 32. See *Spence* v. *Reeder*, 382 Mass. at 420-421. See also *Bogan* v. *New London Housing Authy.*, 366 F. Supp. 861, 866-868 (D. Conn. 1973). We agree with those courts and commentators who point out that the "good cause" restriction on a public landlord's right to evict is inconsistent with a true tenancy at will. See e.g., *McQueen* v. *Druker*, 317 F. Supp. 1122, 1129-1130 (D. Mass. 1970), aff'd, 438 F.2d 781 (1st Cir. 1971). There it is said: "[I]f the government must give good cause for terminating a tenancy, then, in effect, there are no longer monthly or annual leases. A tenant may remain, if not forever, at least until he misbehaves, or he becomes rich, or the government adopts general rules under which he no longer qualifies." See also Schoskinski, American Law of Landlord and Tenant § 13.4 (1980); Note, Public Landlords and Private Tenants: The Eviction of "Undesirables" from Public Housing Projects, 77 Yale L.J. 988, 997 n.48 (1968). Federal and State housing policy, as expressed in statutes, regulations, and recent cases interpreting them, reveals that in creating and providing for public housing, the government intended to depart from traditional concepts of the landlord-tenant relationship. If a traditional description is nonetheless necessary, we think the relationship can be aptly described as a tenancy by regulation.

The pertinent Federal regulation, 24 C.F.R. § 866.58 (1982), requires that a notice to quit "be in writing and

specify that if the tenant fails to quit the premises within the applicable statutory period, or on the termination date stated in the notice of termination, whichever is later, appropriate action will be brought against him." By the language of the present notice to quit, O'Brien was to vacate the premises within thirty days of March 12, 1981, the undisputed date of receipt of the notice. There is, however, no State statute or regulation[12] that sets out the notice period for evictions from federally-aided public housing and which, therefore, might have entitled O'Brien to vacate the premises on a date later than that provided for her in her notice. In this circumstance, we think it appropriate to apply the most analogous State law which is also consistent with the policy underlying the Federal regulation. Cf. *Board of Regents* v. *Tomanio,* 446 U.S. 478, 484-485 (1980); *United Parcel Serv., Inc.* v. *Mitchell,* 451 U.S. 56, 60-63 (1981).

Notices to quit State-aided public housing projects are regulated by 760 Code Mass. Reg. 2.03(6)(f) (1981),[13] which requires that a tenant receive a "written 'Notice to Vacate,' in accordance with applicable law, specifying a date of termination at least thirty (30) days after the notice is given to" the tenant.[14] If O'Brien had been evicted from a State-aided housing project, she would have been entitled to a notice period of "at least thirty (30) days," that which she here received. We think it sensible and consistent to hold that "the applicable statutory period" under § 866.58, is the same as that provided in the analogous § 2.03(6)(f).

---

[12] We interpret the phrase "the applicable statutory period" appearing in § 866.58 as embracing regulations as well as statutes. Cf. *American Fedn. of Labor* v. *Watson,* 327 U.S. 582, 592-593 (1946); *Halt Civic Club* v. *Tuscaloosa,* 439 U.S. 60, 64 (1978).

[13] The BHA also owns and manages a number of State-aided developments. See *Perez* v. *Boston Housing Authy.,* 368 Mass. 333, 342 (1975).

[14] Unlike 24 C.F.R. § 866.58 (1982), the State regulation provides for a notice period of at least thirty days. We, therefore, read the phrase "in accordance with applicable law" as appearing in § 2.03(6)(f) to refer to the form and substance of the notice and not the length of the notice period.

Thus, the trial judge correctly concluded that O'Brien's tenancy did not have to end on a rent day and that she received a proper notice to quit.

4. *Adequacy of Pre-Termination Notices.*

O'Brien argues that she was inadequately apprised by the BHA's notices under 24 C.F.R. § 866.54 and § 866.55 (1982) of what conduct it intended to review to determine whether it should commence eviction proceedings against her.

Assuming without deciding that each of the notices was facially deficient in some respect, we are satisfied that O'Brien knew "with reasonable particularity of the proposed action so that [she could] reasonably prepare h[er] arguments." *Milton* v. *Massachusetts Bay Transp. Authy.*, 356 Mass. 467, 471 (1969). The notices, O'Brien's stipulation of facts, and the whole sequence of events show that she had actual notice that the BHA wished to pursue the fact that her apartment had been searched by the police and drugs found. The facts distinguish O'Brien's situation from that found in the authorities upon which she relies. See e.g., *Escalera* v. *New York City Housing Authy.*, 425 F.2d 853, 862-863 (2d Cir. 1970); *Housing Authy.* v. *Saylors*, 19 Wash. App. 871, 874 (1978).

In a separate but somewhat related claim, O'Brien alleges that at trial the BHA pressed for her eviction on the basis of her responsibility for Harris' conduct; whereas the grievance hearing panel decision suggests that the BHA's position at that hearing was that O'Brien was in possession of and selling the marijuana.[15] She argues that had the notice not been so vague and lacking in detail, the BHA could not have introduced a new theory of good cause at the trial. O'Brien concludes that dismissal of the action is required because there has been no "thoughtful and careful 'in-house' exploration of the competing interests and concerns."

---

[15] The grievance hearing panel decision recites the cause for O'Brien's eviction as being that "[t]enant admitted to drugs being sold out of her apartment." This statement does not unequivocally support O'Brien's present assertion.

The BHA objects to the assertion of this issue, and we think rightfully so. It argues that the claim involves a factual determination which could have been resolved at trial in the BHA's favor by its use of the tape recording of the hearing before the grievance hearing panel. That tape was not put in evidence, and is not part of the record, because O'Brien raised this claim for the first time in her trial memorandum which was submitted well after the close of the evidence. We agree with the BHA that in these circumstances we must invoke the rule "that an issue not raised in the trial court cannot be argued for the first time on appeal." *M. H. Gordon & Son* v. *Alcoholic Beverages Control Commn.*, 386 Mass. 64, 67 (1982).

The record before us reveals that all the procedural requirements set out in 24 C.F.R. § 866.54 through and including § 866.58 (1982) were followed. O'Brien's remaining contentions concerning whether the panel's decision constituted good cause have been answered in *Spence* v. *Gormley, supra.*

5. *Defenses Under G. L. c. 239, § 8A.*

O'Brien argues that the trial judge was in error in refusing to allow her to raise the defense of uninhabitable conditions under G. L. c. 239, § 8A. She concedes that these defenses cannot be raised where an eviction is based upon wrongdoing, or fault, by the tenant. She argues, however, that her eviction was based upon cause and not fault and that she can, therefore, assert uninhabitable conditions.

While cause may not always involve fault by a tenant, cause "is a general term, and must take on much of its meaning from the context in which it is used." *Spence* v. *Gormley,* 387 Mass. at 263. As we stated earlier, O'Brien was not without fault in that she knew of and tolerated Harris' misconduct. The judge was not in error in concluding that the defenses were not available to O'Brien.

*Judgment affirmed.*